# UNITED STATES DISTRICT COURT

### for the
### Middle District of North Carolina

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Information associated with<br>SHAKIELAWATERS@GMAIL.COM email account | )<br>)<br>)<br>)<br>)<br>)    Case No. 1:23MJ125-1 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A1

located in the _____ Middle _____ District of _____ North Carolina _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1347 and 1349 | Health Care Fraud and Conspiracy |
| 18 U.S.C. § 1956(h) | Money Laundering Conspiracy |
| 42 U.S.C. § 1320A-7b(b) | Anti-Kickback Statute |

The application is based on these facts:

See the attached affidavit of U.S. Postal Inspector Alberto Sanabria

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/S/ Alberto Sanabria
_____
*Applicant's signature*

Alberto Sanabria, United States Postal Inspector
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means).*

Date: _____ 03/15/2023  12:46 pm

_____
*Judge's signature*

City and state: _____ Durham, North Carolina _____

Joe L. Webster,  United States Magistrate Judge
_____
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH **SHAKIELAWATERS@GMAIL.COM, GDSINGLETON70@GMAIL.COM, JOELLESCENTEROFHOPE@GMAIL.COM, TBHNC002@GMAIL.COM,** THAT IS STORED AT PREMISES CONTROLLED BY **GOOGLE LLC** | Case No. 1:23MJ125-1 <br><br> **Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Alberto Sanabria, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION**

1.       I am a United States Postal Inspector with the United States Postal Inspection Service and have been so employed for the past seven years. During this time, I have been assigned to the Financial Crimes team where my duties include the investigation of numerous fraud-related criminal statutes, including health care fraud. I have received formal classroom training from the USPIS during the 12-week Postal Inspector Basic Training Academy in Potomac, Maryland. I have received formal instruction from U.S. Postal Inspectors as well as other federal, state and local law enforcement agents who have done extensive work in the areas of health care fraud and wire fraud. Based on my training and experience, I am familiar with the current method of operation that individuals use to submit fraudulent health care claims to receive payment from health care benefit programs as well as the receipt and payment of kickbacks as it relates to patient referrals.

2.       I make this affidavit in support of applications for search warrants for the following Google email addresses (collectively the "TARGET ACCOUNTS"):

   a.   SHAKIELAWATERS@GMAIL.COM ("TARGET ACCOUNT 1")

b. GDSINGLETON70@GMAIL.COM ("TARGET ACCOUNT 2")

c. JOELLESCENTEROFHOPE@GMAIL.COM ("TARGET ACOCUNT 3")

d. TBHNC002@GMAIL.COM ("TARGET ACCOUNT 4")

The information is stored at premises controlled by Google LLC ("Google"), an electronic communications service provider, headquartered at 1600 Amphitheater Parkway, Mountain View, California. The TARGET ACCOUNTS are more particularly described in Attachments A1, A2, A3, and A4. The information to be searched is described in the following paragraphs and in Attachments A1, A2, A3, and A4. This affidavit is made in support of an application for a search warrant under Title 18, United States Code, Sections 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to Google to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

3.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other investigators and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.    Based on my training and experience and the facts as set forth in this affidavit, I respectfully assert that there is probable cause to believe that violations of 18 U.S.C. § 1347 (health care fraud), 18 U.S.C. § 1349 (conspiracy), 18 U.S.C. § 1956(h) (money laundering conspiracy), and 42 U.S.C. § 1320A-7b(b)) (Anti-Kickback Statute) (the "SUBJECT OFFENSES"), among others, have been committed by Shamsher Singh Ahluwalia ("AHLUWALIA"), Gwen Singleton

2

("SINGLETON"), Deborah White ("WHITE"), Shakelia WATERS ("WATERS"), and that evidence of the SUBJECT OFFENSES will be found in the TARGET ACCOUNTS.

5.       This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## JURISDICTION

6.       This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

A.   Background on Medicaid Program and Urine Drug Testing ("UDT")

7.       The North Carolina Medicaid Program is a state-administered program aided by federal funds. Medicaid is designed to provide medical assistance for certain low income individuals and families. Covered services include mental and behavioral health services and substance abuse treatment.

8.       The Division of Health Benefits, North Carolina Department of Health and Human Services (herein referred to as "DHB"), administers the Medicaid Program in North Carolina and oversees mental health providers throughout the state who receive payments from Medicaid.

9.       In the Medicaid Program, a "provider" is defined as any individual or entity furnishing Medicaid services under a provider agreement with the Medicaid Agency. Every provider who participates in the Medicaid Program must apply for and be assigned a unique number by DHB. Providers that participate in Medicaid must also obtain a National Provider

3

Identifier ("NPI"). These provider numbers can be used to identify claims filed by and monies paid to a certain provider.

10.     Two main categories of urine drug tests covered by NC Medicaid are (1) presumptive urine drug tests and (2) definitive urine drug tests. A presumptive urine drug test determines the presence or absence of a drug class in a urine sample. A definitive urine drug test identifies specific medications, illicit substances, and metabolites of these drugs in a urine sample.

11.     The reimbursement rate for a definitive urine drug test is dependent on the number of drug classes tested for:

- The Medicaid code[1] G0480 is used by providers when they test for between one and seven classes of drugs.

- The Medicaid code G0481 is used by providers when they test for between eight and fourteen classes of drugs.

- The Medicaid code G0482 is used by providers when they test for between fifteen and twenty-one classes of drugs.

- The Medicaid code G0483 is used by providers when they test for twenty-two or more classes of drugs.

**Table 1**

| Medicaid Reimbursement Rates for Definitive Drug Testing | | | | |
|---|---|---|---|---|
| Years | G0480<br>(1-7 Drug Classes) | G0481<br>(8-14 Drug Classes) | G0482<br>(15-21 Drug Classes) | G0483<br>(22+ Drug Classes) |

---

[1] The Centers for Medicare and Medicaid Services maintains a list of Current Procedural Terminology (CPT)/Healthcare Common Procedure Coding System (HCPCS) "Codes", which identifies all the items and services included within certain designated health services (DHS) categories or that may qualify for certain exceptions.

4

| 1/1/2018 – 2/29/2020 | $ 72.75 | $ 111.92 | $ 151.09 | $ 195.86 |
|---|---|---|---|---|
| 3/1/2020 - 12/31/2021 | $ 76.39 | $ 117.52 | $ 158.64 | $ 205.65 |
| 1/1/2022 – 3/1/2023 | $ 72.75 | $ 111.92 | $ 151.09 | $ 195.86 |

12.    Medicaid code 80307 is used for a presumptive drug test and its reimbursement rates are listed below.

**Table 2**

| Medicaid Reimbursement Rates for Presumptive Drug Testing | |
|---|---|
| Years | 80307 |
| 1/1/2018 – 2/29/2020 | $ 72.63 |
| 3/1/2020 - 12/31/2021 | $ 76.26 |
| 1/1/2022 – 3/1/2023 | $ 72.63 |

13.    On November 1, 2017, DMA issued Clinical Coverage Policy (No. 1S-8) governing Medicaid claims for drug testing for opioid treatment and controlled substance monitoring (the "DMA Drug Testing Policy").[2] The DMA Drug Testing Policy provides, in pertinent part, that:

- NC Medicaid covers drug testing when it is medically necessary and "is individualized, specific, and consistent with symptoms or confirmed diagnosis" and "not in excess of the beneficiary's needs;"

- A presumptive drug test is medically necessary when it is deemed appropriate by a medical professional as part of the evaluation and management of a beneficiary

---

[2] DHB amended the policy in 2019 and 2021, however, none of the amendments changed the substance of information included in paragraph 13 of this affidavit.

5

who presents with any one of a list of physical symptoms that may indicate drug use;

- Drug tests for NC Medicaid beneficiaries diagnosed with a substance use disorder must be performed at random intervals to properly manage and monitor the beneficiary's care;

- The reasons and drug testing frequency must be documented in the beneficiary's health record; and

- The need for definitive drug testing is based on presumptive screen findings, responses to medical interventions, and treatment plan.

14.     In general, it is not medically necessary to perform a definitive drug test when the presumptive drug test does not indicate the presence of a controlled substance, unless the result is inconsistent with the beneficiary's self-report or other information known to the provider. Likewise, there is generally no medical necessity to simultaneously perform both a presumptive and definitive drug test because the results of the presumptive drug test should be reviewed before a definitive drug test is performed.[3]

---

[3] There is an exception for reference laboratories. As reference laboratories do not have access to beneficiary health records, Medicaid and NCHC shall cover reflex testing in the following circumstances: 1) To verify a presumptive positive drug test using definitive methods before reporting the presumptive finding to the ordering provider and without an additional order from the provider; or 2) To confirm the absence of a prescribed medication when a negative result is obtained by presumptive drug testing in the laboratory for a prescribed medication listed by the ordering provider.

15.     Furthermore, it is generally not medically necessary to perform a definitive drug test for twenty-two plus classes of drugs; rather, the testing should be tailored to the individual patient and his/her known issues with controlled substances.

B. Relevant Entities and Individuals

16.     Dr. Shamsher Singh AHLUWALIA is a medical doctor who was been licensed with the North Carolina Medical Board since 2009.

17.     Trinity Behavioral Healthcare PC ("Trinity") is a Psychiatric/Mental/Substance Abuse Health Care clinic located at 2716 Troxler Road in Burlington, North Carolina. AHLUWALIA owns Trinity. Per filings with the North Carolina Secretary of State, Trinity was formed on November 13, 2014.

18.     Simrun Health Services Inc. ("Simrun") is a Clinical Laboratory Improvement Amendment ("CLIA") certified laboratory that provides drug testing services.[4] Simrun is also located at 2716 Troxler Road in Burlington, North Carolina. Per filings with the North Carolina Secretary of State, Simrun was formed on September 8, 2009. AHLUWALIA is listed Registered Agent and President of Simrun.

19.     Serenity Billing Solutions, LLC ("Serenity") is an entity created by Shakiela WATERS. Per filings with the North Carolina Secretary of State, Serenity was formed on February 23, 2018 and was located at 2307 W. Cone Boulevard, Suite 140 in Greensboro, North Carolina. WATERS is listed as the Registered Agent and only Managing Member. (Serenity is now listed

---

[4] The Clinical Laboratory Improvement Amendments (CLIA) regulate laboratory testing and require clinical laboratories to be certified by the Center for Medicare and Medicaid Services (CMS) before they can accept human samples for diagnostic testing.

7

as administratively dissolved.) WATERS previously worked for AHLUWALIA at Trinity and Simrun.[5]

20.     Deborah WHITE is the Registered Agent and owner of Reginald Center of Turn Around, which is located at 2302 W Meadowview Road, Suite 221, Greensboro, North Carolina 27407. According to its website, Reginald Center of Turn Around ("RCOTA") is a substance-abuse treatment center located in the Middle District of North Carolina. Per filings with the North Carolina Secretary of State, RCOTA was formed on January 17, 2013.

21.     Gwendolyn SINGLETON is the Registered Agent and President of Joelle's Center of Hope ("Joelle's"), which is located at 2804 Randleman Road Suite G, Greensboro, North Carolina 27406.

22.     SINGLETON is also the Registered Agent and President of Visionary Consultants, Inc. Per filings with the North Carolina Secretary of State, Visionary Consultants was formed on March 22, 2019 and was located at 2804 Randleman Road Suite F in Greensboro, North Carolina.

23.     Donald BOOKER was the owner of United Youth Care Services ("UYCS"), United Youth Care Foundation ("UYCF"), and United Diagnostic Laboratories ("UDL"). In January 2023, BOOKER was convicted of health care fraud, multiple violations of the Anti-Kickback Statute, money laundering conspiracy, and money laundering. According to court documents and trial evidence, between about January 2016 and August 2019, BOOKER and others paid kickbacks to other co-conspirators in exchange for urine samples from Medicaid-eligible beneficiaries. The urine samples were provided to UDL and UYCS for medically unnecessary urine drug testing.

_____

[5] AHLUWALIA owned a third business, Triad Medical Group, which appears to now be closed.

8

Booker and his co-conspirators paid a kickback from the Medicaid reimbursement they received from the drug testing.

C. Scheme to Defraud

24.     The Health and Human Services – Office of Inspector General ("HHS-OIG"), United States Postal Inspector Service ("USPIS"), and the North Carolina Attorney General's Medicaid Investigations Division ("MID") are currently investigating AHLUWALIA and his associated entities, Gwen SINGELTON, Deborah WHITE, and other related entities and persons. This investigation addresses information and allegations that indicate that these entities and persons were engaged in a scheme to bill the North Carolina Medicaid Program for medically unnecessary drug tests and to pay and/or receive kickbacks for the collection urine specimens from Medicaid beneficiaries for medically unnecessary testing.

**Medically Unnecessary Urine Drug Screens**

25.     Around May 2019, Witness 1, a former employee of Trinity and AHLUWALIA, submitted an online health care fraud complaint to HHS-OIG. In the complaint, Witness 1, who is a licensed clinical social worker in North Carolina, alleged that AHLUWALIA used her NPI[6] without her knowledge or consent to bill Medicaid for medical services that she never provided to clients.

26.     In November 2022, Witness 1 was interviewed regarding her complaint. Witness 1 stated that she worked for Trinity from 2013 to 2017 and confirmed she filed the 2019 HHS-OIG online complaint stating that AHLUWALIA and Trinity were using her name and NPI to bill

---

[6] Providers must obtain a federal identification number, known as a National Provider Identifier, or "NPI," number for among other things, billings purposes.

claims through Medicaid and private insurance companies without her knowledge. Witness 1 stated that another employee of Trinity, Shakiela WATERS, discovered that AHLUWALIA was using Witness 1's NPI without her knowledge and subsequently brought it to her attention. Witness 1 said that AHLUWALIA required all patients to be drug tested regardless of whether a drug test was necessary based on the patient's diagnosis.

27.     In May of 2022 and January of 2023, WATERS was interviewed regarding her work with AHUWALIA and Serenity Billing Solutions. WATERS started working for AHLUWALIA in 2013 and stated that one of her responsibilities was to review and process medical records and bill claims to insurance companies. WATERS said that she worked as a "W-2" employee for AHLUWALIA between 2013 and 2017. Between 2017 and 2022, WATERS worked as both a "W-2" employee and a 1099 contractor.

28.     According to WATERS, AHLUWALIA told her he was being audited by the North Carolina Department Medicaid Investigations Division ("MID") and was concerned about the audit. WATERS said that AHULWALIA required all patients to be urine drug tested, including children, and regardless of whether the testing was medically necessary based on diagnoses. WATERS said that several psychiatrists and nurse practitioners who worked with AHLUWALIA complained about this practice. WATERS said that both a presumptive and definitive urine drug test would be run for all patients, even when the patient tested negative on the presumptive screen or did not have a substance abuse diagnosis. WATERS recalled AHLUWALIA advising her to bill all patients using bill codes G0483 (the highest rate) and 80307.

29.     According to WATERS, AHLUWHALIA admitted that he was not supposed to be billing the G0483 drug billing code for every screening—i.e., the code is used when a definitive drug test is run for 22 or more classes of drugs.

10

30.     MID completed a claims analysis related to all Medicaid claims submitted by Simrun. This analysis revealed that between 2017 and 2021, Medicaid received approximately 23,820 claims for billing code 80307, which is listed as a presumptive drug screen, and 24,684 claims for billing code G0483, which is the definitive drug screen. In other words, AHLUWALIA billed for presumptive and definitive drug screens in almost a 1:1 ratio.

### Urine Drug Testing Kickbacks

31.     WATERS explained in her interview that Simrun was originally helping patients with medication management but turned into a laboratory "possibly" around 2016. WATERS said that the laboratory was AHLUWALIA's "money maker."

32.     WATERS explained that AHLUWALIA would pay other third-party providers either a set fee or percentage to refer urine drug testing to Simrun. WATERS identified SINGLETON as one of the third-parties that AHLUWALIA paid for urine drug test referrals to Simrun.

33.     WATERS said that AHLUWALIA started working with SINGLETON and Joelle's Center of Hope between 2018 and 2019. WATERS described Joelle's as providing substance abuse services. WATERS explained that AHLUWALIA would pay SINGLETON to refer urine samples to Simrun for testing. WATERS explained that at first, AHLUWALIA was paying SINGLETON directly for the referrals.

34.     WATERS said that AHLUWALIA then decided he should not pay SINGLETON directly because it would be an "anti-kickback" issue. WATERS noted that AHLUWALIA reached out to an attorney to discuss the anti-kickback statute, and then decided to hire "marketers" to pay for samples instead. Because the Anti-kickback statute provides for certain safe harbors such as when the third party provides other services (i.e. marketing), individuals who are

11

attempting to hide their illegal behavior often attempt to structure business arrangements to facially appear as though they are compliant with the statute.

35.    According to WATERS, AHLUWALIA knew that she owned Serenity Billing Solutions and approached her about a marketing agreement drafted by AHLUWALIA and his attorney. WATERS also said that AHLUWALIA met with WATERS and SINGLETON, and they discussed making payments to SINGLETON through Serenity Billing Solutions, instead of from AHLUWALIA directly.[7]

36.    A review of records from Simrun Health Services', Bank of America (BOA) account ending in 1970, corroborated WATERS' statements that Simrun was initially paying SINGELTON directly.

**Table 3**

| Account Name | Date | Check # | Paid To | Amount |
|---|---|---|---|---|
| Simrun Health Services Inc. | 11/15/2018 | 1069 | Gwendolyn Paul Singleton | (16,550.00) |
| Simrun Health Services Inc. | 11/29/2018 | 1080 | Gwendolyn Paul Singleton | (8,600.00) |
| Simrun Health Services Inc. | 12/14/2018 | 1082 | Gwendolyn Paul Singleton | (12,000.00) |
| Simrun Health Services Inc. | 12/14/2018 | 1083 | Gwendolyn Paul Singleton | (12,000.00) |
| Simrun Health Services Inc. | 12/28/2018 | 1085 | Joelle's Center of Hope | (9,250.00) |
| Simrun Health Services Inc. | 1/9/2019 | 1092 | Joelle's Center of Hope | (11,000.00) |
| Simrun Health Services Inc. | 1/16/2019 | 1097 | Joelle's Center of Hope | (26,600.00) |

---

[7] According to WATERS, AHLUWALIA admitted to her that the NC MID audit would result in a criminal matter because he was paying other people for, what he referred to as, "marketing payments" and it would be an issue with respect to kickbacks.  WATERS also said that AHLUWALIA knew she was going to be interviewed and told her, "I didn't pay directly from provider to provider, right?"

12

37.     The investigation identified a contract between Serenity Billing Solutions and Simrun Health Services dated March 15, 2019, titled "Consulting Support Services Agreement and Letter of Understanding for Business Development and Marketing Services." The terms of the marketing agreement listed the services to be performed, compensation terms, and condition that all new business must adhere to the various regulatory agencies as well Anti-Kickback laws.

38.     The agreement additionally outlined a monthly flat fee payment of $40,000 paid by Simrun Health Services to Serenity Billing Solutions purportedly for new program development in behavioral healthcare. WATERS admitted to receiving approximately $120,000 from Simrun Health Services as part of the agreement but kept only $20,000 for herself. WATERS explained that she was also directed to use a portion of the remaining funds to pay SINGELTON directly. Additionally, WATERS stated that AHLUWALIA required her to pay him back part of the remaining money, and then he would use that money to pay employees, contractors, and others believed to be billers of AHLUWALIA. When asked to clarify why AHLUWALIA would pay WATERS additional monies over her hourly employment rate for duties she would normally be required to do as an employee, WATERS said she believed it was to develop AHLUWALIA's businesses. WATERS was only able to list the attempted creation of business brochures to support the claim that she helped develop his businesses.

39.     Given statements made by WATERS regarding the work she performed as a marketing contractor for AHLUWALIA, a lack of evidence showing the services listed in the contract were actually performed, the flat fee payment structure, and the requirement for WATERS to pay other contractors and associates of AHLUWALIA from the payments made directly to her, there is probable cause to believe that AHLUWALIA attempted to use the marketing contract with WATERS as a safe harbor provision for kickbacks funneled through Serenity Billing Solutions.

13

40.    A review of records from Simrun Health Services' Bank of America (BOA) account ending in 1970, during the period of January 2019 to September 2019, revealed that seven checks and one online bank transfer totaling $195,500 was paid by Simrun to Serenity Billing Solutions, LLC as seen below in Table 4.

**Table 4**

| Account Name | Date | Check # | Paid To / From | Amount |
|---|---|---|---|---|
| Simrun Health Services Inc | 09/09/19 | N/A | Serenity Billing Solutions, LLC | (23,400.00) |
| Simrun Health Services Inc | 08/07/19 | 1114 | Serenity Billing Solutions, LLC | (25,000.00) |
| Simrun Health Services Inc | 04/15/19 | 1102 | Serenity Billing Solutions, LLC | (50,000.00) |
| Simrun Health Services Inc | 03/08/19 | 1132 | Serenity Billing Solutions, LLC | (4,150.00) |
| Simrun Health Services Inc | 03/15/19 | 1116 | Serenity Billing Solutions, LLC | (25,000.00) |
| Simrun Health Services Inc | 02/13/19 | 1138 | Serenity Billing Solutions, LLC | (17,950.00) |
| Simrun Health Services Inc | 02/27/19 | 1139 | Serenity Billing Solutions, LLC | (20,000.00) |
| Simrun Health Services Inc | 01/30/19 | 1123 | Serenity Billing Solutions, LLC | (30,000.00) |

41.    BOA records confirm the checks and transfers were deposited into the Serenity Billing Solutions, BOA account ending in 4657. Additional account analysis showed that once the deposits were cleared into Serenity Billing Solutions account, most of the funds associated with those deposits/transfers were withdrawn, in cash, within three days of the deposits being made. The funds were used, in part, to write checks made payable to individuals linked to AHLUWALIA, such as SINGELTON and SINGLETON's daughter, A.R.

42.    A breakdown of the outbound transactions is listed below.

**Table 4**

***BOA 4657 Outbound Transactions Related to Simrun Health Services Deposits***

| Paid From | Posted Date | Paid To | Memo / Notes | Inflows | Outflows |
|---|---|---|---|---|---|
| Simrun Health Services | 01/30/19 | Serenity Billing Solutions | Note-(1099) | $30,000.00 | |
| Serenity Billing Solutions, LLC | 01/31/19 | Gwendolyn Singleton | Note-Cashier's Check | | (12,520.00) |
| Serenity Billing Solutions, LLC | 01/31/19 | A.R. | Note-Cashier's Check | | (3,865.00) |
| Serenity Billing Solutions, LLC | 01/31/19 | Z.S. | Note-Cashier's Check | | (6,080.00) |
| Serenity Billing Solutions, LLC | 01/31/19 | A.G. | Note-Cashier's Check | | (2,400.00) |
| Serenity Billing Solutions, LLC | 02/01/19 | Cash Withdrawal | | | (6,000.00) |
| Serenity Billing Solutions, LLC | 02/01/19 | Gwendolyn Singleton | Note-Cashier's Check | | (8,520.00) |
| Simrun Health Services | 02/13/19 | Serenity Billing Solutions | Note-illegible | $17,950.00 | |
| Serenity Billing Solutions, LLC | 02/14/19 | A.R. | Memo-1/21 - 1/31 | | (3,822.50) |
| Serenity Billing Solutions, LLC | 02/14/19 | A.G. | Memo-1/21 - 1/31 | | (2,100.00) |

14

| | | | | | |
|---|---|---|---|---|---|
| Serenity Billing Solutions, LLC | 02/14/19 | A.S.G. | Memo-1/21 - 1/31 | | (1,275.00) |
| Serenity Billing Solutions, LLC | 02/14/19 | Gwen Singleton | Memo-1/21 - 1/31 | | (8,205.00) |
| Simrun Health Services | 02/27/19 | Serenity Billing Solutions | | $20,000.00 | |
| Serenity Billing Solutions, LLC | 02/28/19 | Z.S. | Memo-1/30 - 2/6 | | (3,178.00) |
| Serenity Billing Solutions, LLC | 02/28/19 | A.R. | Memo-2/1 - 2/15 | | (3,275.50) |
| Serenity Billing Solutions, LLC | 02/28/19 | A.G. | Memo-2/1 - 2/15 | | (1,618.00) |
| Serenity Billing Solutions, LLC | 02/28/19 | A.S.G. | Memo-2/1 - 2/15 | | (1,275.00) |
| Serenity Billing Solutions, LLC | 03/01/19 | Gwen Singleton | Memo-2/1 - 2/15 | | (7,678.00) |
| Simrun Health Services | 03/08/19 | Serenity Billing Solutions | Note-illegible | $4,150.00 | |
| Serenity Billing Solutions, LLC | 03/11/19 | Cash Withdrawal | | | (4,150.00) |
| Simrun Health Services | 03/15/19 | Serenity Billing Solutions | | $25,000.00 | |
| Serenity Billing Solutions, LLC | 03/18/19 | Cash Withdrawal | | | (9,000.00) |
| Serenity Billing Solutions, LLC | 03/18/19 | Square-Asia | Square | | (1,155.00) |
| Serenity Billing Solutions, LLC | 03/18/19 | A.R. | Memo-2nd Feb | | (4,500.00) |
| Serenity Billing Solutions, LLC | 03/18/19 | A.G. | Memo-2nd half of Feb | | (2,000.00) |
| Serenity Billing Solutions, LLC | 03/18/19 | Z.S. | Memo-2nd week of Feb | | (3,500.00) |
| Simrun Health Services | 04/15/19 | Serenity Billing Solutions | Note-March | $50,000.00 | |
| Serenity Billing Solutions, LLC | 04/16/19 | Transfer x2025 | | | (8,000.00) |
| Serenity Billing Solutions, LLC | 04/16/19 | Cash Withdrawal | | | (12,685.00) |
| Serenity Billing Solutions, LLC | 04/16/19 | A.S.G. | Note-Cashier's Check | | (1,000.00) |
| Serenity Billing Solutions, LLC | 04/16/19 | Z.S. | Memo-March 2019 | | (5,920.00) |
| Serenity Billing Solutions, LLC | 04/16/19 | A.G. | Memo-March 2019 | | (4,185.00) |
| Serenity Billing Solutions, LLC | 04/16/19 | A.R. | Memo-March 2019 | | (6,556.50) |
| Serenity Billing Solutions, LLC | 04/16/19 | Gwen Singleton | Memo-March 2019 | | (9,000.00) |
| Simrun Health Services | 08/07/19 | Serenity Billing Solutions | | $25,000.00 | |
| Serenity Billing Solutions, LLC | 08/07/19 | Cash Withdrawal | | | (2,600.00) |
| Serenity Billing Solutions, LLC | 08/07/19 | A.G. | Zelle | | (1,300.00) |
| Serenity Billing Solutions, LLC | 08/08/19 | U.A. | Note-Cashier's Check | | (16,864.61) |
| Serenity Billing Solutions, LLC | 08/09/19 | Cash Withdrawal | | | (5,800.00) |
| Serenity Billing Solutions, LLC | 08/09/19 | A.G. | Zelle | | (500.00) |
| Simrun Health Services | 09/09/19 | Serenity Billing Solutions | Online Transfer | $23,400.00 | |
| Serenity Billing Solutions, LLC | 09/09/19 | Transfer x2205 | | | (5,000.00) |
| Serenity Billing Solutions, LLC | 09/09/19 | Cash Withdrawal | | | (6,000.00) |
| Serenity Billing Solutions, LLC | 09/09/19 | Gwendolyn Singleton | Note-Cashier's Check | | (7,000.00) |
| Serenity Billing Solutions, LLC | 09/12/19 | Cash Withdrawal | | | (1,500.00) |
| | | | | $195,500.00 | (190,028.11) |

43. WATERS said in her interview that the payment arrangement with Serenity as the intermediary was only in place for a short time. WATERS said that after using Serenity, AHLUWALIA drafted a contract with SINGLETON and WHITE directly.

**Kickbacks from BOOKER**

44. Witness 2 was debriefed on multiple occasions between 2022 and 2023. Witness 2 worked for BOOKER at UYCS. Witness 2 detailed the various co-conspirators that referred urine samples to BOOKER in exchange for kickbacks, including SINGLETON, who operated Joelle's, and WHITE, who operated RCOTA.

15

45.     Witness 2 said that SINGLETON was receiving a lot of money in the form of kickbacks. Witness 2 explained that when SINGLETON's volume increased, she would create a new company to receive kickbacks through. WITNESS 2 said that SINGLETON had three different shell companies, one of which was owned by her daughter.

46.     Witness 2 also said that WHITE had numerous shell companies set up to receive kickback payments. WHITE asked for kickback payments to be made payable to "Church of Restoration Inc." WHITE also had her daughter create a company so that WHITE could receive kickback payments through that company.

47.     Serenity Billing Solutions BOA bank records also reveal that from May 2019 to September 2019, nine checks issued by United Youth Care Services/United Youth Care Foundation for $40,822 were deposited into the account, as seen below in Table 5. The checks were signed by BOOKER.

**Table 5**
***United Youth Care Services Checks made to Serenity Billing Solutions***

|  |  |  |  | Totals: |
|---|---|---|---|---|
|  |  |  |  | $40,822.23 |

| Account Name | Posted Date | Paid From | Memo / Notes | Inflows |
|---|---|---|---|---|
| Serenity Billing Solutions, LLC | 05/15/19 | United Youth Care Services | Note-Pay Period 04/22/2019 to 05/05/2019 | $822.23 |
| Serenity Billing Solutions, LLC | 06/07/19 | United Youth Care Services | Note-Pay Period 05/20/2019 to 06/02/2019 | $5,000.00 |
| Serenity Billing Solutions, LLC | 06/21/19 | United Youth Care Services | Note-Pay Period 06/03/2019 to 06/16/2019 | $5,000.00 |
| Serenity Billing Solutions, LLC | 07/05/19 | United Youth Care Foundation | Note-Pay Period 06/17/2019 to 06/30/2019 | $5,000.00 |
| Serenity Billing Solutions, LLC | 07/19/19 | United Youth Care Foundation | Note-Pay Period 07/01/2019 to 07/14/2019 | $5,000.00 |
| Serenity Billing Solutions, LLC | 08/02/19 | United Youth Care Foundation | Note-Pay Period 07/15/2019 to 07/28/2019 | $5,000.00 |
| Serenity Billing Solutions, LLC | 08/16/19 | United Youth Care Foundation | Note-Pay Period 07/29/2019 to 08/11/2019 | $5,000.00 |
| Serenity Billing Solutions, LLC | 08/30/19 | United Youth Care Foundation | Note-Pay Period 08/12/2019 to 08/25/2019 | $5,000.00 |
| Serenity Billing Solutions, LLC | 09/13/19 | United Youth Care Foundation | Note-Pay Period 08/26/2019 to 09/08/2019 | $5,000.00 |

48.     Serenity Billing Solutions bank records show that after the United Youth Care checks were deposited into the account, approximately $13,906 was withdrawn from the account in cash and approximately $4,232 paid in bank transfers. Additionally, records show approximately $4,902 in Cash App mobile payment transfers were paid, with $1,820 of that being paid to SINGLETON's Cash App account.

### AHLUWALIA/SINGLETON/WHITE Laboratory

49.     DHB received a "Clinical Laboratory Improvements Amendments (CLIA) Application for Certification" dated May 5, 2021 for Joelle's Center of Hope as the facility (and listing TARGET ACCOUNT 3 as the business email address) The Application listed AHLUWALIA as the Lab Director and Simrun's address (2716 Troxler Road) as the "facility address." In other words, the application claimed that Joelle's was applying to run a laboratory at 2716 Troxler Road and that AHLUWALIA was serving as the director.

50.     Aneshia Gutierrez is listed as the owner of the laboratory; and AHLUWALIA's apparent signature is on the form as the "owner/director of the laboratory." Gutierrez is SINGLETON's daughter. Witness 2 said in interviews that SINGLETON would use Gutierrez to receive and conceal kickback payments.

51.     The application indicated that the lab would be associated with Simrun's lab and a lab for "Reginald's Center of Turnaround" – i.e., the company owned by WHITE.

52.     Around December 2020, Reginald's Center of Turnaround (RCOTA) began billing Medicaid directly for urine drug testing. Between about December 2020 and February 2023, RCOTA billed Medicaid for 8292 units of presumptive drug tests using the code 80307 and 8344

17

units of definitive drug tests using the G0483 code – i.e., almost a 1:1 ratio of presumptive and definitive tests.

53. Between January 2021 and December 2022, Joelle's also billed Medicaid directly for urine drug testing. Between that time frame, Joelle's billed Medicaid for 5449 units of presumptive drug tests using the code 80307 and 5452 units of definitive drug tests using the G0483 code – i.e., almost a 1:1 ratio of presumptive and definitive tests.

## PROBABLE CAUSE TO BELIEVE TARGET ACCOUNTS USED IN FURTHERENCE OF VIOLATION

54. During the first interview with WATERS, MID investigators served her with a Civil Investigative Demand Subpoena requesting her to provide emails related to correspondence between she, AHLUWALIA, SINGLETON, and others involved with Medicaid urine drug testing claims. WATERS stated that her personal email, SHAKIELAWATERS@GMAIL.COM, was used to send and receive emails related to her work with AHLUWALIA.

55. Upon reviewing email signature lines and display names associated with each email, investigators were able to identify the users of the accounts as follows:

     i. SHAKIELAWATERS@GMAIL.COM ("TARGET ACCOUNT 1"): Shakiela WATERS

     ii. GDSINGLETON70@GMAIL.COM ("TARGET ACCOUNT 2"): Gwen SINGLETON

     iii. JOELLESCENTEROFHOPE@GMAIL.COM ("TARGET ACCOUNT 3"): Gwen SINGLETON

     iv. TBHNC002@GMAIL.COM ("TARGET ACCOUNT 4"): Yelena Larkin-Jones

     v. Simrun14@yahoo.com: Shamsher AHLUWALIA

**Emails between SINGLETON, WATERS, and AHLUWALIA**

18

56.     A review of the emails provided by WATERS reveals that on March 10, 2019, an email with the subject line, "Fw: Follow Up" was forwarded from AHLUWALIA's Yahoo email address to SHAKIELAWATERS@GMAIL.COM. This email was also sent to GDSINGLETON70@GMAIL.COM, which is the email address associated with Gwen Singleton. The email contained the following originating email message, that was sent to AHLUWALIA by his attorney:

> Based on our conversation, I understand you are exploring converting your existing treatment facility exclusive use laboratory to a reference laboratory with you owning 100% of the lab entity. Step by Step (which you also have sole ownership of) would refer samples to the reference laboratory as well as receiving samples from other practices. The issue in this structure is: as an owner of Step by Step you are in a position to influence referrals to an entity in which you also have an ownership interest in (and which bills federal programs) and thereby profiting from those referrals.

> As I mentioned during our call, we have reviewed this scenario in the past and believe this structure falls outside of any safe harbor to the antikick back statute. I am attaching a memo we prepared reviewing a different but similar scenario for a prospective client. I thought it might be helpful as you consider your options. Again, the memo is not specific to your set of facts and not intended to be legal advice (as I am in house counsel to SLP) but may provide useful information on the ownership/investment requirements of the safe harbor.

The email additionally contained an attachment titled, "AnitKickback_safeharbor (1).docx."

57.     On March 14, 2019, an email with the subject line of "DR Ahluwalia [SMITHLAW-RDU.015811.00001]" was forwarded from AHLUWALIA's Yahoo email address to SHAKIELAWATERS@GMAIL.COM and GDSINGLETON70@GMAIL.COM. The email contained the following originating email message, that was sent by AHLUWALIA to his attorney:

> Good Morning,
> Can you please review this Marketing Contract and then we can discuss on it. Please provide me time to call for it. Also i have a meeting with SLP LAB today for negotiating the price. they came down to 67, 000, to get out of contract.
> Thanks
> Shamsher Ahluwalia

58. On March 15, 2020, Gwen Singleton sent an email with a subject line of "RCOTA CMS APPLICATION" from her email address GDSINGLETON70@GMAIL.COM to SHAKIELAWATERS@GMAIL.COM. The email body had the following message, "Here is the application form", with a signature line, "Gwen Singleton." The email also contained an attachment titled, "RCOTA CMS116.pdf". Court records show that SINGLETON entered a business relationship with Deborah WHITE and RCOTA sometime in 2019.

59. On August 5, 2020, AHLUWALIA sent an email with a subject line of "Contract" from his Yahoo email address, Simrun14@yahoo.com, to WATERS at SHAKIELAWATERS@GMAIL.COM. WATERS confirmed that AHLUWALIA primarily used the email address simrun14@yahoo.com to send and receive work-related emails. The email body contained no text but did contain an attachment titled, "Serenity_Billing_contract.docx.pdf".

60. On October 23, 2020, Singleton sent an email with a subject line of "Requested email" from GDSINGLETON70@GMAIL.COM to SHAKIELAWATERS@GMAIL.COM and AHLUWALIA's Yahoo email address containing the following message,

> The work that are being bought into the lab is from me or my office. I am only the consultant on with
> the two companies.
> Sent from the desk of Gwen Singleton

61. Furthermore, on December 28, 2020, and email with a subject line of "Lab Contract" originating from AHLUWALIA's Yahoo email address was sent to both SHAKIELAWATERS@GMAIL.COM and GDSINGLETON70@GMAIL.COM, containing an attachment titled, "SHS lab agreement Reginald center of turn around.docx."

20

62.     On April 7, 2021, AHLUWALIA sent an email with a subject line of "CLIA" from his Yahoo email address to GDSINGLETON70@GMAIL.COM. The email did not contain a message in the body but did contain an attachment titled, "Joelles CLIA (1)(signed).pdf".

63.     On May 20, 2021, AHLUWALIA sent an email with a subject line of "LAB Invoices" from his Yahoo email address to GDSINGLETON70@GMAIL.COM. The email body had the following message,

> Good Morning,
> As per agreed 2 weeks in our text messages around may 1st that you
> will pay pending invoices after billing in Nc tracks and get paid, but you
> still have not paid the remaining balance, also no samples were sent
> for april and may, after waiting long, i have asked for Legal help.
> Also because of these issues I am not leasing the Greensboro building
> to you guys.
> Thanks

This email additionally contained three attachments titled, "CONTRACT AMENDMENT. Docx", "Invoice of Reginald Center.xlsx", and "Lab contrac [sic] reginald.pdf".

64.     In addition to emails WATERS provided from her SHAKIELAWATERS@GMAIL.COM email address, she also provided emails related to her Serenity Billing Solutions email address, swaters@serenitybillingsolutions.com. On May 18, 2021, WATERS sent an email from her swaters@serenitybillingsolutions.com email address with a subject line "CLIA Applications" to JOELLESCENTEROFHOPE@GMAIL.COM containing the following message:

> Good Afternoon,
> I've attached the applications reflecting the updated hours of operations for Simrun,
> RCOTA, and
> Joelle's. Please let us know if any additional information is needed.
> Thanks for all of your help!
> Shakiela

The email also contained the following attachments:

21

Simrun Updated CLIA.pdf
New JCOH CMS-116._Application_042020 (2) (1).pdf
RCOTA Update hours CMS-116._Application_042020 (1) (1).pdf
Joelle's CLIA Signature Page.pdf
Simrun CLIA Signature Page.pdf
RCOTA CLIA Signature Page.pdf

**Emails with Larkin Jones: TBHNC002@GMAIL.COM**

65.    On April 26, 2021, AHLUWALIA sent an email with a subject line of "UPDATED INVOICE" from his Yahoo email address to Yelena Larkin-Jones at her email address, TBHNC002@GMAIL.COM.    AHLUWALIA    also    sent    the    email    to GDSINGLETON70@GMAIL.COM. The email contained the following text in the body, "Yallena [sic] missed 120 samples of feb, which we are putting now in March invoice." According to WATERS, Larkin-Jones worked in the lab at Simrun Health Services and taught AHLUWALIA how to operate the drug testing equipment.

66.    On June 7, 2021, AHLUWALIA responded to an email with a subject line of "Re: Multiple laboratories operating at same location" from his Yahoo email address. AHLUWALIA sent the email to TBHNC002@GMAIL.COM and GDSINGLETON70@GMAIL.COM. The email contained the following text in the body, "

> Good Morning,
> As I discussed with you on phone that we are not running Life Enhancement lab since december 2020 and Reginald center of turnaround lab since may 1st 2021. Please terminate CLIA FOR THEM.

The email contained additionally contained two attachments titled, "Multiple laboratories.pdf" and "CMS-116-Apr2020.pdf."

22

## BACKGROUND CONCERNING EMAIL

67.    In my training and experience, I have learned that Google provides a variety of on-line services, including electronic mail ("email") access, to the public. Google allows subscribers to obtain email accounts like the email accounts listed in Attachment A. Subscribers obtain an account by registering with Google. During the registration process, Google asks subscribers to provide basic personal information. Therefore, the computers of Google are likely to contain stored electronic communications (including retrieved and unretrieved email for Google subscribers) and information concerning subscribers and their use of Google services, such as account access information, email transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

68.    In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and my experience, I know that, even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

69.    In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*,

23

session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

70.     In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

71.     This application seeks a warrant to search all responsive records and information under the control of Google, a provider subject to the jurisdiction of this court, regardless of where Google has chosen to store such information. The government intends to require the disclosure pursuant to the requested warrant of the contents of wire or electronic communications and any records or other information pertaining to the customers or subscribers if such communication, record, or other information is within Google's possession, custody, or control, regardless of

24

whether such communication, record, or other information is stored, held, or maintained outside the United States.

72.     Google maintains the communications, files, and associated records for each service used by a Google Account on servers under its control. Even after a user deletes a communication or file from their Google Account, it may continue to be available on Google's servers for a certain period of time.

73.     As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the email provider can show how and when the account was accessed or used. For example, as described below, email providers typically log the Internet Protocol (IP) addresses from which users access the email account, along with the time and date of that access. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information

25

integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

## CONCLUSION

74.     Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Google, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

/s/ Postal Inspector Alberto Sanabria
Alberto Sanabria
Postal Inspector
United States Postal Inspection Service

In accordance with Rule 4.1(b)(2)(A), the Affiant attested under oath to the contents of this Affidavit, which was submitted to me by reliable electronic means, on this 15th day of March, 2023, at 12:46 p.m.

Honorable Joe L. Webster
United States Magistrate Judge
Middle District of North Carolina

26

## ATTACHMENT A1

### Property to Be Searched

This warrant applies to information associated with SHAKIELAWATERS@GMAIL.COM that is stored at premises owned, maintained, controlled, or operated by Google LLC ("Google"), a company headquartered at 1600 Amphitheater Parkway, Mountain View, California.

## ATTACHMENT B

### Particular Things to be Seized

**I. Information to be disclosed by Google LLC ("Google")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Google, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to Google, Google is required to disclose to the government for each account or identifier listed in Attachment A the following information from January 1, 2019 through present, unless otherwise indicated:

   a. The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

   b. All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

   c. The types of service utilized;

   d. All records or other information stored by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files; and

e.    All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

The Provider is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

## II.     Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of violations of 18 U.S.C. § 1347 (health care fraud), 18 U.S.C. § 1349 (conspiracy), 18 U.S.C. § 1956(h) (money laundering conspiracy), and 42 U.S.C. § 1320A-7b(b) (Anti-Kickback Statute), involving the TARGET ACCOUNTS between January 1, 2019 through present, in the following form:

a.   Evidence referencing urine drug testing;

b.   Evidence referencing payments for referrals of urine drug testing or other related Medicaid-billable services;

c.   Evidence referencing Medicaid beneficiaries who have provided urine for testing;

d.   Evidence referencing claims submitted to Medicaid for urine drug testing or related Medicaid-billable services; and

e.   Evidence referencing laboratories, laboratory costs, laboratory directors or personnel, and/or laboratory certifications.